## WELLS VS. THE AMERICAN EXPRESS COMPANY.

EXPRESS COMPANY: AGENCY. *(1, 2, 4, 5) Liability of express company for acts of its local agents. (3) Packages addressed to two persons jointly, not partners; notice and delivery to either sufficient.*
APPEAL TO SUPREME COURT. *(6) Reversal of judgment.*

[1. It *seems* that if the agent of an express company receives goods consigned to him as such for delivery to the purchaser, and, having in his hands for collection at the same time a bill for the price of such goods, delivers them to the purchaser, the company becomes liable to the consignor, whether the agent in fact collects the bill or not.]

2. Where goods are not delivered to an express company, but are sent by railway to their place of destination consigned to the purchaser *in the care* of the express company's agent at that place, and never come into his possession, but are delivered by the railway company directly to the purchaser, without fault of the express company or its agent, and a bill of such goods, sent also to such agent for collection, not being paid by the purchaser, is promptly returned by the agent, no liability of the express company to the consignor is created by these facts.

3. C., having an order for goods, borrowed money of W. to enable him to fill the order, and, upon shipping the goods, both C. and W. requested the purchaser to send the purchase money to W.; but he sent it by express in a package addressed to C. & W. jointly. *Held*, that although there was no such firm as C. & W., notice or delivery to either of them was notice or delivery to both.

4. A common carrier is not bound by its agent's knowledge or notice of facts outside of his duties and employment as such agent.

5. The mere fact, known to the express company's agent at the office of delivery of the above mentioned package, that W. had shipped goods to the sender of the package, and had sent to the proper agent of such company a bill of the goods for collection from him, which had been returned unpaid, would not render the express company liable to W. for the value of the package, or of W.'s interest therein, after its delivery to C.

6. If any liability of the express company to W. was shown in this action, still the judgment must be reversed because some of the special findings of the jury, upon which it rests, as to the *extent* of such liability, are unsupported by the evidence.

APPEAL from the Circuit Court for *Racine* County.

Action for the sum of $400, alleged to have been collected by the defendant's agent at Marshalltown, Iowa, from one Downs for the use of the plaintiff, and transmitted to defendant's agent at Racine in this state, but which, it is alleged, the latter has neglected and refused to pay over to the plaintiff on demand.

The facts shown by the evidence as understood by this court, will appear from the opinion.

The following facts were found by the jury by special verdict, in response to questions propounded at plantiff's request: 1. That on the 6th of September, 1864, plaintiff shipped to Marshalltown, Iowa, to one W. H. Downs, in care of defendant's agent at that place, eight wagons, which were the property of the plaintiff.    2. That defendant received from said plaintiff a bill of said wagons in plaintiff's favor and against Downs, and agreed to collect the money thereon, and transport it to the plaintiff at Racine, for a valuable consideration to be paid by plaintiff.    [This bill was in the following form: " MARSHALLTOWN, IOWA, Sept. 6, 1869.   W. H. DOWNS,   To A. S. WELLS, Dr.   To eight new lumber wagons completed as ordered of F. Cartright, $800.00."]   3. *That defendant collected $400 from Downs on account of said wagons.*   4. That defendant's agent at Racine was instructed, when the money should be collected and transported to Racine, to pay it to Herman Warner; and that Warner demanded the money from said agent, after it was received at Racine, and the agent refused to deliver it to the plaintiff, or to Warner for his use.   5. That the reasonable value of defendant's services in receiving said consignment of wagons, collecting the money on account thereof from Downs, and transporting it to Racine, was $1.50.   6. That it was in the regular course of defendant's business, under its contract with the plaintiff, when its agent at Marshalltown, Iowa, delivered the wagons to Downs, to have collected the amount due plaintiff on the bill, receipted it, and delivered it to Downs, and transported the

money to Racine to be paid over to plaintiff.   7. That the money was received at Racine, and demanded by Warner, about the 22d of September, 1864.   8. That there was due the plaintiff from the defendant, at the date of the trial, $398.50, with interest thereon from the date of said demand.

In response to questions propounded at defendant's request, the jury found, 1. That at the time of the shipment of the wagons, the following letters were sent to Downs by the plaintiff and Cartright respectively:   "Racine, Sept. 6th, 1864. W. H. Downs, Esq., Dear Sir: Having advanced money to Mr. F. Cartright to get up the seven wagons built by him, I have bought them with the understanding that they should be shipped to you on his trade with you, and this is the reason they are shipped in my name.   *   *   *   Mr. Cartright has enclosed a letter stating the situation of the wagons, etc.   *   * *   A. S. WELLS."   "Racine, Sept. 6th, 1864.   Mr. Downs, Dear Sir: I have shipped you this day seven wagons of my own make, and one of John Criswick's make, which *Mr. Wells* bought to make out the car load.   *   *   *   *Mr. Wells* has advanced me money on the wagons to get them up in a hurry, and I have billed the wagons in his name. As you wrote us that you was prepared to pay for them when you received the wagons, we thought that [we would] send the bill for collection right along with the wagons; for I am very hard up just now, having to borrow money to makes wagons and pay interest on it and every ———— to build them well.  Will have another car-load about the last of this month.   You will send the money to *Mr. A. S. Wells, Esq.;* the bill is made to him.   *   *   *   FINIS CARTRIGHT."   2. That Downs brought the $400 in question to the express office at Marshalltown; that the money was inclosed in an envelope addressed to "Cartright & Wells, Racine, Wisconsin," and with the words "From W. H. Downs" written on the margin.  4 and 5. That Downs did not "write or direct the address to be written" on said envelope; but that "he gave them the names of Cartright and

*Wells.*" 6. That said money was the proceeds of the wagons shipped to Downs as above stated. 11. That defendant had some notice, other than by plaintiff's bill against Downs, sent to its agent at Marshalltown for collection, that the wagons belonged to the plaintiff. 12. That the plaintiff had the sole interest in said bill. 20. That plaintiff and one Beecher shipped fourteen wagons under the receipt given by the railroad company. [This refers to a receipt, put in evidence by the plaintiff, given by the Chicago & Milwaukee Railroad, dated Racine, September 6, 1864, and acknowledging the receipt by the railroad company from "Beecher & Wells" of fourteen wagons, marked " W. H. Downs, Marshalltown, Iowa, Care Am. Express Agent." It appears that six wagons made by one Beecher were sent to Downs in the same car with the eight included in plaintiff's bill, and that the railroad company's receipt was for the whole car-load.] 21. That the wagons shipped by plaintiff under said railroad receipt were in some way " marked or distinguished from those shipped under said receipt by Beecher." 22. That defendant's agent at Marshalltown " was advised by Downs on which wagons said $400 was paid."

The motion to set aside the verdict as contrary to the evidence was denied; and judgment was rendered for the plaintiff for the amount found by the jury; from which the defendant appealed.

For the appellant, a brief was filed by *Finches, Lynde & Miller*, and the cause was argued orally by *H. M. Finch*.

*John T. Fish*, for the respondent.

ORTON, J. The complaint in this action which came to this court on appeal from the first judgment, charged that the defendant, as a common carrier, received the wagons in question from the plaintiff, and undertook to carry and deliver them to the consignee and purchaser, Downs, at Marshalltown in the state of Iowa, and to collect on such delivery, from Downs,

the sum of eight hundred dollars, the value and proceeds of the same, for the plaintiff.

The complaint as amended and now before this court, charges, in effect, that the defendant received from the plaintiff, at Racine, a bill or account for the sum of eight hundred dollars, in favor of the plaintiff and against Downs, for the wagons sold to Downs by the plaintiff, and shipped by the Chicago & Milwaukee Railroad Company, to Downs, in the care of the agent of the defendant at Marshalltown, Iowa, and undertook to collect of Downs said bill upon the delivery of the wagons to him, and to transport the said sum, when collected, from Marshalltown to Racine, and deliver the same to the plaintiff.

By these two complaints the cases are very materially and widely different, and the liability of the defendant would depend upon very different evidence and principles. Under the present complaint, it is doubtful whether the defendant would be liable by reason of its duties and obligations as a common carrier, or as the agent and factor of the plaintiff for the collection of the money; as in the latter case the defendant would not be bound to transmit to the plaintiff the identical money received, as a common carrier, but would be merely liable to pay to the plaintiff generally so much money had and received, or paid to the defendant for the use of the plaintiff, less collection fees and expenses.

The complaint alleges that the consignment was made to Downs *in care* of the agent of the defendant at Marshalltown, and, *inferentially* at least, that the wagons were delivered by the railroad company to the agent of the defendant, and were delivered by the agent to Downs, by stating that the defendant collected from Downs, on said bill, the sum of four hundred dollars.

If it be true that the agent of the defendant did so deliver the property, as consignee, to Downs, the purchaser, having in his hands at the same time the said bill for eight hundred

dollars, the price of the wagons, with or without payment, the defendant would be liable to pay the plaintiff the entire sum. Angell on Carriers, § 324, and cases cited.

The complaint, however, fails to state that the property ever came into the possession of the defendant, or its agent at Marshalltown, or that the company or its agents, either at Racine or Marshalltown, had any thing to do with the property or its delivery to Downs.·

The facts proved upon the last trial present a very different case from the one made by either the former or the present complaint. The variance seems to be wide and material, if indeed there was not a failure of proof; but, no objection having been taken in the circuit court on this ground, and the variance, if any, having been there disregarded, it will be disregarded here.

The evidence is clear that the express company, the appellant, had nothing to do with the transportation or delivery of the wagons to Downs, and, although the wagons were consigned to Downs in care of its agent at Marshalltown, the agent did not receive them, and of course could not have delivered them to Downs. They were probably delivered by the railroad company directly and personally to Downs; and there is no evidence that the agent of the defendant at Marshalltown knew anything about it, or had anything to do with it, or that the agent collected of Downs any of the money in the bill sent to him, or that Downs paid the agent any money. The bill, therefore, was returned to the office of the company at Racine, unpaid. This disposes entirely of the question of the liability of the defendant, either as the carrier of the wagons, as alleged in the first complaint, or as the consignee of the property and factor of the plaintiff at Marshalltown to collect the proceeds of its sale to Downs and pay it to the plaintiff when so collected, as alleged in the present complaint.

The fact that the bill for eight hundred dollars was sent to the agent at Marshalltown for collection from Downs upon

the delivery to Downs of the eight wagons, presupposes that the wagons would be delivered by the railroad company to said agent, and that he would deliver them to Downs upon his payment of the money. This arrangement seems to have been materially changed, or to have failed, the cause of which does not appear in the evidence very clearly; but one thing is quite clear, that the defeat or failure of the original purpose of this transaction is not attributable to any act or neglect of the agent, or of any one on behalf of the company, the appellant. The change was caused solely by the interference of the plaintiff, or by the fault of the railroad company in not delivering the property to the agent of the express company; for neither of which can the appellant be now held responsible.

What is, then, the nature of the transaction as disclosed by the evidence, and what was the responsibility assumed by the defendant, or the liability incurred, if any? The real transaction was, that Downs sent, by the express company, a package addressed to "Cartright & Wells, Racine, Wisconsin," on the margin of which was written the words, "From W. H. Downs." This will appear from the evidence hereafter referred to. There appears to be nothing in the evidence to make this transaction differ from an ordinary one of an express company receiving a package from a consignor at one point on its route, to be carried to another point and delivered to the consignees named in the address and directions upon the package. There seem to have been no directions or contract outside of and inconsistent with this plain and simple transaction. Downs was the consignor, the express company was the common carrier, and Cartright and *Wells* were the joint consignees. From the address upon the package, the agent of the express company at Racine had a right to presume that the package belonged jointly to Cartright and *Wells*, and that it could rightfully and properly be delivered to either one of them. But if this presumption in the mind of the agent, Hall, arising from the directions of the package itself, should

be weakened by his previous knowledge that *Wells* had sent a bill or account of eight hundred dollars for the wagons, against Downs, to the agent of the company at Marshalltown, for collection, or if he had reason to suppose, from such knowledge, that the package contained the money arising from the sale of the wagons by *Wells* to Downs, and no other money, at the same time he had even better reason to suppose, from the directions upon the package and the manner in which it had been sent, and from the fact that the said bill had been returned unpaid, that the previous transaction and arrangement had been changed and modified by the parties themselves, and that the package had been sent and directed accordingly. But whatever knowledge or notice the agent might have previously had, of the rights and relations of the parties, inconsistent with the directions of the consignment, which was in the ordinary course of business of the company, the defendant would not be bound by his knowledge or notice of facts outside of his legitimate duties and employment. Story on Agency, §§ 140, 451, and cases cited; *Marshall v. American Express Co.*, 7 Wis., 1; *Sawyer v. The C. & N. W. Railway Co.*, 22 id., 403; *Congar v. The C. & N. W. Railway Co.*, 24 id., 157.

There is no dispute as to the arrival of the package at the place of destination; and at least one of the consignees had notice of it. There may not have been any such firm or co-partnership as Cartright & Wells, in Racine at the time; but there were such *persons*, and they were the joint consignees of the package, and a delivery to one would have been a delivery to both; and so, also, notice to one in respect to the package so marked and addressed, would have been notice to both. Story on Agency, § 44; *Hubbard v. Galusha*, 23 Wis., 398.

It is already manifest that the apparent ownership of the money in the package was in Cartright and *Wells* jointly; but to whom did the money actually belong?

The evidence is perfectly clear and conclusive that the money

actually belonged to both Cartright and *Wells* jointly. In what precise proportion they owned it, or the interest of each in it, is not shown by the evidence, and is still an open question.

In answer to the question: "From whom did you order the wagons?" Downs testified that he bargained with Cartright, and did not know *Wells* at the time, and had been in the habit of buying wagons of Cartright, and that he ordered these wagons by letter; and, in explanation of his evidence that "he received the wagons from the plaintiff," he said that he meant the same wagons he bargained for of Cartright, and that at the time of the purchase he did not know any other person in the purchase than Cartright, and that he received no directions as to how the money should be sent, but had been in the habit of sending in that way, by express, to different parties in Racine, but not to Cartright and *Wells*; that the money *was sent* September 21st, 1864, and *and was the only package of money he sent about that time to Cartright and Wells; that he put the money in the envelope himself, saw it sealed and directed, and took the receipt,* and gave the address to be put on the package; and that it was put on as he gave it. It was admitted, on the trial, that the package of $400 is the only one in dispute, and that it is the $400 *sent by Downs.* The plaintiff testified that he owned the eight wagons shipped to Downs, and that he *advanced money to* Mr. Cartright for some lumber before the wagons were made. Downs, when asked how he came to send the money to Cartright and *Wells*, answered that "he received a letter from each of them, *both stating that they had sent the wagons; and as he had bought of Cartright and did not know Wells, he thought he would send the money to both of them, marked Cartright & Wells.*"

Here we have the explanation by Downs himself, both of the nature of the interest of the plaintiff and of the reason why the package was sent by Downs to Cartright and *Wells,* in-

stead of to the plaintiff alone.   In the letter of the plaintiff to Downs, produced on the trial and of the same date as the shipment of the order, bill or account for the eight hundred dollars, he says:  " *Having advanced money* to Mr. F. Cartright to get up the seven wagons built by him, I have bought them with the understanding that they should be shipped to you *on his trade* with you; and this is the reason they are shipped in my name; the money for them *is belonging to me to a certain amount.*"   In the letter of Cartright to Downs of the same date, he says: " I have shipped you this day seven wagons of my own make.   *   *   *Mr. Wells has advanced* me money on the wagons to get them up in a hurry, and I have billed them in his name.   *   *   We thought that [we would] send the bill for collection with the wagons; *for I am very hard up just now,* having to borrow money to make wagons, and pay interest on it.   *   *   Will have another car load about the last of this month.   You will send the money to *Mr. A. S. Wells, Esq.*   The bill is made to him."

It seems that Downs did not see fit to send the money to *Wells* alone, according to this order, thinking, doubtless, that as the money belonged to them both, and as he had bought the wagons of Cartright and did not know *Wells*, it would be more proper for him to do so.   This important change in the first arrangement, through which the wagons failed to come to the possession of the agent of the defendant, and to be delivered by him to Downs upon his payment of the eight hundred dollars according to the bill or account sent to him, and which caused the said bill to be sent back unpaid, took place without the knowledge or fault of the defendant or its agents, and the defendant is not responsible in any manner for it.

This evidence most clearly shows that Cartright made and owned *seven* of the eight wagons sent to Downs, and that they were sent and delivered on Downs' purchase and order, at an agreed price and terms of purchase; for Downs testifies that terms were to be one-half down and the balance on time, which

shows that even the bill itself for the whole amount to be paid on the delivery of the wagons, was a mistake.

This evidence further shows that the only interest which the plaintiff had in the wagons or money was for money advanced by him to Cartright, to aid him in getting them up; that the wagons were his security for this loan; and that they were therefore shipped in the plaintiff's name, to Downs, and the money was to be sent to the plaintiff for his further security for the payment of the amount of his advances to Cartright on the wagons, and interest, and the residue (whatever that might be) belonged to Cartright. This evidence will not bear any other construction; and the conclusion is inevitable, that neither the wagons nor the money belonged *solely* to the plaintiff; but it more properly establishes the fact that both belonged to Cartright alone, subject to the lien or security of the plaintiff for the payment of the money he had advanced to Cartright; and, in the aspect most favorable to the plaintiff, that they both owned *jointly* the wagons, and are jointly entitled to their proceeds, according to their several interests.

The statements of both Cartright and *Wells* in their evidence, that *Wells* owned the wagons or the money, are mere conclusions of their own, most wrongfully drawn from the facts, which clearly show that both were owned jointly by the plaintiff and Cartright.

We think we are safe in saying, that there was no evidence to sustain the first and twelfth findings in the special verdict asked for by the plaintiff, and the other findings based upon the theory of the sole ownership of the money by the plaintiff. There is no evidence whatever that the express company, the appellant, *collected* the money of Downs, or that it was paid by Downs to the company or its agent on account of said wagons; and therefore the third finding in said verdict was clearly erroneous.

Indeed, all the findings for the plaintiff seem to have been based upon the theory that the money was actually collected

Wells vs. The American Express Co.

by the defendant from Downs upon the bill of eight hundred dollars, according to the first probable arrangement, which was utterly abandoned afterwards by the parties, and that, too, without the fault of the defendant, and therefore *that* bill was returned unpaid.

These errors are so apparent, and so important, that it will be unnecessary to refer to the questions arising from the garnishee proceedings against the defendant in the attachment suits against Cartright, or the notices deposited in the post-office at Racine, addressed to Cartright and *Wells*, of the garnishee proceedings, and tendering their defense to them, any further than to suggest that, so far as Cartright is concerned (and he was joint owner of the money), he was a party to the record in those proceedings, and is presumed to have had notice, and leave the questions open as to whether the notice to Cartright and *Wells*, deposited in the postoffice, was not sufficient as to both and each of them, in respect to any intermeddling or interference with or diversion of the package addressed jointly to them, and its contents, and as to whether they are both presumed to have received said notice.

This case was very ably argued by the learned counsel on both sides in this court, and all the light possible thrown upon the questions involved; and the apparent confusion and inconsistencies in the evidence, and the entire want of it on the question as to the proportionate interest of the plaintiff and Cartright in the money, are doubtless to be attributed to the length of time the case has been pending, and the absence or forgetfulness of witnesses. But the case must be disposed of upon the record before us; and, for the manifest errors above pointed out, the judgment must be reversed.

*By the Court.* — The judgment of the circuit court is reversed, with costs, and the cause remanded for a new trial.